**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**


| | |
|---|---|
| CODEPRO INNOVATIONS LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) C.A. No.: 12-970-MPT |
| | ) |
| SAFEWAY INC., | ) |
| Defendant. | ) |
| | ) |
| CODEPRO INNOVATIONS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) C.A. No.:  12-1482-MPT |
| | ) |
| THE STOP & SHOP SUPERMARKET | ) |
| COMPANY LLC AND GIANT FOOD LLC, | ) |
| DefendantS. | ) |
| | ) |

## MEMORANDUM ORDER

**I.    Introduction**

The above-captioned matters are two patent actions initiated by Codepro

Innovations LLC ("Codepro"),[1] consolidated for the purpose of a limited early claim

construction,[2] against Safeway Inc. ("Safeway"),[3] and also against The Stop & Shop

Supermarket Company LLL ("Stop & Shop") and Giant Food LLC ("Giant") (collectively

"defendants"),[4] alleging infringement of U.S. Patent Nos. 5,717,866 ("the '866 patent")

and 5,924,078 ("the '078 patent") (collectively the "patents-in-suit").  The parties

requested early claim construction for a single claim term, "promotional code," which is

---

[1] Codepro is the assignee of both the 5,717,866 and the 5,924,078 patents.  The inventor of both
patents is Walter L. Naftzger.
[2] D.I. 23.
[3] C.A. No.:  12-970-MPT.
[4] C.A. No.:  12-1482-MPT.

common to both patents.[5]  Briefing on this issue is completed,[6] and the *Markman*

hearing on the parties' respective constructions on the disputed term occurred on April

22, 2013.  This memorandum order sets forth the court's construction of that term.

The patents-in-suit are related.  The '866 patent is a divisional patent of the '078

patent, and issued before the '078 patent.  Both patents share similar specifications.

Construction of the disputed claim term, promotional code, is the same for both patents.

## II.    Background and Claims of the Patents-in-Suit

The '078 patent, titled consumer provided promotional code actuatable point-of-

sale discounting system, was filed on June 28, 1996, and issued July 13, 1999.[7]  The

'866 patent, captioned method for comparative analysis of consumer response to

product promotions, was filed on August 1, 1996 and issued February 10, 1998.[8]  The

patents-in-suit generally relate to point-of-sale systems which are capable of providing

discounts in response to customer usage of "promotional codes."[9]  Claim 1 of the '078

patent as exemplary of that patent recites:

> A computer-implemented discounting system for use in conjunction with a
> point-of-sale transaction device comprising:
>
> a device which accepts promotional codes entered as a series of
> characters;
>
> a memory subsystem, said memory subsystem storing information related

---

[5] D.I. 23.

[6] Although the parties filed briefs in both matters, the briefs are the same in each case. Defendants were required to file joint briefs.  As a result, reference to the docket entries in this opinion are just to the earlier filed matter 12-970-MPT, but equally apply to the second action, 12-1482-MPT.  Briefing in the first action is as follows:  Codepro's opening brief (D.I. 99), defendants' opening brief (D.I. 95), Codepro's responsive brief (D.I. 103), and defendants' responsive brief (D.I. 101).

[7] D.I. 104, Ex. A.

[8] *Id.*, Ex. B.

[9] *See id.* Ex. A at 2:48-55; D.I. 96, Ex. 2 at 3:10-19.

to at least one promotion, said information comprised of a promotional code, a product code and a discount amount for each of said at least one promotion;

a software module, coupled to said device and said memory subsystem;

said software module receiving said promotional codes entered by customers using said device, using said information held in said memory subsystem to determine if said entered promotional codes relates to one or more of said at least one promotion and transmitting discount information for said promotions related to said entered promotional codes to said point-of-sale transaction device, and wherein said software module compares said received promotional codes with said promotional codes stored in said memory subsystem and, if said received promotional codes match one of said promotional codes stored in said memory subsystem, said software module transfers said product code and said discount amount corresponding to said matched promotional code to said point-of-sale transactional device.[10]

Claim 1 of the '866 patent recites:

A method for comparative analysis of consumer response to product promotions which provide discounts during point-of-sale transaction, comprising the steps of:

storing in a memory subsystem of a computer system, a series of at least two promotional codes and a corresponding series of at least two promotional information entries, each one of said series of promotional codes and corresponding one of said series of promotional information entires related to separate promotions for a product;

determining a total number of times a first one of said series of promotional codes is transmitted to said computer system via a user interface, coupled to said computer system, by consumers responding to a first promotion for said product, said consumers transmitting said first promotional code receiving a first discount included as part of a first promotional information entry which corresponds to said first promotional code;

determining a total number of times a second one of said series of promotional codes is transmitted to said computer system via said user interface by consumers responding to a second promotion for said

_____

[10] D.I. 104, Ex. A, claim 1.

3

product, said consumers transmitting said second promotional code receiving a second discount included as part of a second promotional information entry which corresponds to said second promotional code; and

comparing said total number of times said first one of said series of promotional codes is transmitted to said computer system to said total number of times said second one of said series of promotional codes is transmitted to said computer system.[11]

## III.   Claim Construction

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."[12]  The claims are not read in a vacuum, but are read in "context of the entire patent, including the specification."[13]  Although claim terms define the invention, the "specification, the prosecution history, and extrinsic evidence concerning . . . the meaning of technical terms" help the court understand what the disputed claim language means to one of ordinary skill in the art at the time of the invention.[14]  "The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."[15]

"There are two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full

---

[11] D.I. 96, Ex. B claim 1.

[12] *Thorner v. Sony Computer Entertainment Amer. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*)); *see also Phillips*, 415 F.3d at 1313 ("We have made clear . . . that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

[13] *Phillips*, 415 F.3d at 1313.

[14] *Id.*, 415 F.3d at 1314.

[15] *Id.* 1315 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

scope of a claim term either in the specification or during prosecution."[16]  In order for a patentee to act as his own lexicographer he "must 'clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning."[17]  An inventor has clearly set forth a definition if the same "word [is used] in the same manner in all embodiments."[18]  A patentee may disavow claim scope "'[w]here the specification makes clear that the invention does not include a particular feature.'"[19]  This disavowal takes the particular feature "'outside the reach of the claims . . . even though the language of the claims . . . might be considered broad enough to encompass the feature in question.'"[20]

In construing the term, the court must take care that it does not "read limitations from the specification into the claims," and does "not redefine words."[21]  "It is the claims that define the metes and bounds of the patentee's invention, [and] [t]he patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."[22]

| Claim Term | CodePro's Construction | Defendants' Construction |
|---|---|---|
| "Promotional Code" | "a series of characters associated with discount information" | "a paperless coupon advertised as a code that corresponds to and promotes a product; not a customer identification code" |

---

[16] *Thorner,* 669 F.3d at 1365.  *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).
[17] *Thorner,* 669 F.3d at 1365 (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).
[18] *Id.* at 1365.
[19] *Id.* at 1366 (quoting *SciMed Life Sys., Inc. v. Adv. Cardiovascular. Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).
[20] *Id.* (quoting *SciMed Life Sys.*, 242 F.3d at 1341.
[21] *Id.* at 1366.
[22] *Id.* at 1367.

IV.    Discussion

CodePro argues its construction gives "clarity to the claim language and flows from the language of the claims" pointing primarily to language in the field of the invention, parts of other claims, and the four embodiments to support its admittedly broad, plain meaning for promotional code.[23]   It contends defendants' construction violates the fundamental principles of not "reading limitations from the specification into the claims, by importing such language as '*paperless coupon*,' '*advertised*,' and cannot be '*a customer identification code*.'"[24]   By incorporating a negative claim limitation regarding customer identification code, it maintains defendants attempt to rewrite the claim term by inserting a disclaimer unsupported by the intrinsic record.[25]   CodePro further contends defendants' construction, by including "*correspond[] to a product*" and "*promote[] a product*," incorporates functional limitations taken from the background section and the preferred embodiments.[26]   Since the specifications only describe the problems in the prior art, those descriptions do not constitute any disavowal of claim scope.[27]   In responding to defendants' arguments, CodePro notes the claims never

---

[23] D.I. 99 at 5 (citing D.I.104, Ex. A at 18:24-25 claim 1 of the '078 patent "a device which accepts promotional codes entered as a series of characters"); *id.* (referencing D.I. 104, Ex. A. at 21:54-58 claim 24 "determines if said received codes are promotional codes and transmits discount information, for each determined promotional code"); *id.* at 5-6 (citing D.I.104, Ex. A at 23:24-33 claim 30); *id.* at 6 (D.I. 104, Ex. A at 1:7-12 Field of Invention); *id.* ( referencing D.I. 104, Ex. A at 2:57-65 the first embodiment, and emphasizing within this embodiment "*promotional codes entered as a series of characters*" and *"determines if the entered promotional codes relate to one of the promotions*"); *see also id.* at 6-8 (further support that promotional code consists of a series of character which are related to a discount) (emphasis in brief).
[24] D.I. 99 at 9 (emphasis in original).
[25] *Id.* at 10 (citing *Amgen, Inc. v. Ariad Pharms., Inc.* 577 F. Supp. 2d 724, 729 (D. Del. 2008) ("[T]o the extent that a patentee's claim construction is tantamount to rewriting the claims to insert a negative claim limitation, it is noted that a negative limitation or exclusionary proviso must have basis in the original disclosure.").
[26] *Id.* at 9.
[27] D.I. 103 at 5.

6

discuss how a consumer learns of the promotional code making the limitation "advertised" improper.[28]  Defendants language "corresponds to and promotes a product," according to CodePro, is specifically contradicted by the specifications of the asserted patents, which contain a "variety of correlations between promotional codes, products and other criteria . . . so that a single promotional code can correspond to multiple products."[29]  Similarly, defendants' limitation excluding a customer identification number is not consistent with the intrinsic evidence, as argued by CodePro, because the only reference to a customer identification number in the specifications relates to the discussions of the prior art reference, Valencia,[30] which addresses the use of a smart card, but provides no support for distinguishing promotional code from a customer identification number.[31]  CodePro argues the difference between the inventions of the patents and Valencia is the "manner in which information is provided to the system (magnetic card versus manual input)," with the patents silent on differentiating between promotional code and other types of codes or numbers.[32]

Defendants criticize CodePro's approach to claim construction as violating the *Philips* court admonition of "[r]ather than starting with a broad definition and whittling down,"courts should "focus[] at the outset on how the patentee used the claim term in

[28] *Id.* at 5 (quoting *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) ("A patentee's discussion of the shortcomings of certain techniques is not a disavowal of the use of those techniques in a manner consistent with the claimed invention.").
[29] *Id.* at 6 (citing D.I. 100, Ex. A at 13:28-35 ("In one embodiment of the invention, the promotional code entries 20-N may include **multiple entries having the same promotional code** entered in the promotional code filed 20-N-1 but different promotional information entered in the other fields, for example, the product code field 20-N-4 and/or the discount field 20-N-5. ***By doing so, a discount for any member of a product family may be provided by use of a single promotional code.***")) emphasis in brief).
[30] U.S. Pat. No. 5,380,991.
[31] D.I. 103 at 8, (citing D.I. 104, Ex. A at 2:14-19; 6:28-40).
[32] *Id.* at 8.

the claims, specification, and prosecution history."[33]  They point to CodePro's cursory reference to the '866 patent, and argue its preamble to claim 1 expressly limits promotional code "**to separate promotions for a product**,"[34] thereby limiting the scope of the invention to product promotions, and similarly restricting the scope of promotion code.  Because of the emphasis in the specifications to address the problems of the prior art, defendants maintain promotional code should be limited to publicly distributed promotional codes, as well as paperless coupons for promotion of a product.[35]

Defendants point to the embodiments of the '078 patent regarding promotional code, noting the patentee recognized his invention as the use of promotional codes in lieu of paper coupons.[36]  They also maintain the prosecution history for both patents supports their position since the patentee acknowledged promotional codes as synonymous with paperless coupons, as evidenced by his differentiation of the prior art reference, Weinblatt,[37] and the description by the Patent Office in the online search request form of the '866 patent.[38]

Defendants also claim that by distinguishing Valencia in the specifications, and

---

[33] D.I. 101 at 2 (discussing *Philips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005)).

[34] *Id.* at 3, 9-10 (emphasis in brief).

[35] D.I. 95 at 5 (relying on the '078 patent at 1:49-2:52).

[36] *Id.* at 6 (citing '078 patent at 16:58-61).

[37] *Id.*  When the examiner cited U.S. Patent No. 5,515,270 ("Weinblatt"), as a prior art reference, to overcome anticipation, the patentee argued: "Weinblatt does not offer paperless coupons or any other type of discount . . . . einblatt has no mechanism to offer promotional codes or paperless coupons to consumers, such that the consumer receives a discount for purchasing a product using the promotional code.  Claims 1, 3-24 and 31-39, as amended, all require a system that accepts promotional codes which are used to deliver discounts to consumers, or the step of discounting an item based on the receipt of a valid promotional code."  *See* D.I. 96, Ex. 3 at 4-5.

[38] *Id.  See* D.I. 96, Ex. 4 ("An advertising/promotional sales method where consumers (potential consumers) instead of using physical coupons may by audio media . . . as well as other physical advertising sources . . . get a product's promotion code and give this for entry into the computer at the point of sale and get a discount off the product just as a coupon would have.").

Weinblatt during prosecution, the patentee disclaimed customer identification numbers to provide discounts,[39] because Valencia teaches a smart card issued to a customer, which contains the customer's identification number, and to overcome Weinblatt which offered a "unique personal code," the patentee distinguished the present invention that uses a promotional code.[40]

Since the patents are related and share similar specifications and a claim term, the court "must interpret the claim consistently across all asserted patents."[41]  The term "promotional code" appears in all independent claims of the patents-in-suit.  The '078 patent is "a point-of-sale discounting system in which the consumer uses publicly distributed promotional codes while the sales transaction is on-going to automatically receive discounts on purchase goods.  It is, therefore, the object of the invention to provide such a point-of-sale discounting system."[42]  The background of the invention of the '078 patent describes how a consumer obtains or is aware of a promotional code.  Promotional codes are publicly distributed to consumers.[43]  The specification of the '078 patent further acknowledges the problem in the prior art it addresses, that is, the failure "to overcome the aforenoted deficiency . . . in that discounts are not usedto attract the consumer to the store.  Instead, the discounts are made available to all consumers who visit the store and select coupons."[44]  Specifically, the prior art failed to "directly motivate a consumer to, in response to a specific advertised promotion, visit a particular store to

---

[39] D.I. 95 at 10.
[40] *Id.*; see also D.I. 101 at 9.
[41] *NTP v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).
[42] D.I. 104, Ex. A at 2:48-55.
[43] *Id.* at 2:50.
[44] *Id.* at 2:25-27.

take advantage of the promotion."[45]  Although "retailers have long relied upon the

discounting of goods as a method to attract customers" by reducing the price on

selected goods and using the media through advertisements to promote the selected

price reductions, referred to as "specials," "advertised specials are disliked by many

retailers because of its inability to discriminate between price-conscious and casual

consumers."[46]

     After a series of embodiments and aspects, the specification summarizes as

follows:

> By providing the aforementioned system, a discounting system having a
> number of characteristics advantageous to retailers has been designed.
> *Specifically, by requiring the consumer to provide a promotional code
> advertised in the media in order to receive a discount upon purchasing the
> advertised goods,* the retailer can provide the discount only to those
> consumers whose purchase is motivated by the discount while selling the
> goods at full price to those consumers whose purchase is unmotivated by
> the promotion.  hus, the cost, to the retailer, for promoting the sale of
> goods using discounts can be substantially reduced.[47]

     Claim 1 of the '078 patent recites a system comprising "a device which accepts

promotional codes entered as a series of characters.[48]  Claim 1 also states that a

memory subsystem stores information related to at least one promotion,[49] and this

information is comprised of a promotional code, a product code, and discount amount.[50]

It further requires "a software module coupled to said device and said memory

subsystem," with the software module "receiving said promotional codes entered by

---

[45] *Id.* at 2:42-44.
[46] *Id.* at 1:14-17.
[47] *Id.* at 18:1-12 (emphasis added).
[48] *Id.* at 18:20-25.
[49] *Id.* at 18:26-27.
[50] *Id.* at 18:27-30.

consumers using said device."[51]

Claim 1 of the '866 patent is a method claim "comprising the steps of . . . by consumers responding to a first promotion for said product, said consumers transmitting said first promotional code receiving a first discount . . . ."[52]  As with the '078 patent, the specification of the '866 patent represents:

> Thus, there has been described and illustrated herein, a system which analyses [sic]customer response to product promotions based upon consumer usage of promotional codes in connection with point-of-sale discounting systems *in which the consumer uses publicly distributed promotional codes* while the sales transaction is on-going *to automatically receive discounts on purchased goods.*  By providing the aforementioned system, it is now possible to readily compare consumer response to *various advertising campaigns in which promotional codes were distributed,* thereby enabling the retailer to carefully tailor future advertising campaigns based upon consumer usage of *promotional codes distributed in prior advertising campaigns.*"[53]

The use of promotional codes is part of a system to accomplish the objectives of the patents-in-suit; it not the only means within the patented systems to meet their objectives.  Rather, it is the combinations within the claims or a series of steps that permit retailers to distinguish between price conscious and casual consumers under the '078 patent, and through the '866 patent, allow them to compare consumer responses to various advertising campaigns, and thereafter appropriately modify future advertising campaigns.

When describing each invention as a whole, the patents state the object of each invention is to provide a system in which the consumer uses publicly distributed

---

[51] *Id.* at 18:31-34.
[52] D.I. 96, Ex. 2 at 16:65-67; 17:11-14.
[53] *Id.* at 16:44-56 (emphasis added).

promotional codes.[54]  The specification further explains in multiple references

throughout the '078 patent that the discounting system taught is one where the

consumer uses publicly distributed promotional codes, which differentiate groups of

consumers, the stated object of that invention.[55]  The '866 patent also teaches publicly

distributed promotional codes.[56]

      CodePro suggests that because the claims are silent on how a consumer learns

of a promotional code, any limitation in that regard operates as improper importation

from the specification.  That argument ignores *Philips,* which recognized that "claims

'must be read in view of the specification, of which they are a part,'"[57] as the

specification is the "highly relevant . . . single best guide to the meaning of a disputed

---

[54] D.I.104, Ex. A at 2:48-55; *id.*, Ex. B at 3:12-15.

[55] *Id.*, Ex. A at 2:50-51; *See also id.* at 11:41-44 ("The printer is most commonly used during analysis of consumer response to advertisements which provide the promotional codes used to generate discounts when purchasing items.); *id.* at 16:53-58 ("Consumers will enter the retailer's establishment knowing one or more promotional codes and will enter the promotional codes during point-of-sale transactions.  It is contemplated that consumers will learn the promotional codes from advertisements run by the retailer in the print, radio or television media . . .However, should the retailer decide to associate multiple promotional codes with a single product, considerable information regarding the success of alternate advertising campaigns may be derived . . . ."); *id.* at 17:4-12 ("However, promotional code '123' may be printed in an advertisement in a daily newspaper while the promotional code '124' may be printed in a weekly entertainment magazine.  Thus, consumers who decide to purchase the item based upon the advertisement in the daily newspaper will use one promotional code to receive the discount while consumers who decide to purchase the item based upon the advertisement in the weekly magazine will use a different promotional code to receive the discount."); *id.* 17:30-42 (discussing the information on the relative success of advertising campaigns obtained through the use of promotional codes, "if 10,000 consumers entered the promotional code advertised in the daily newspaper, while only 150 consumers entered the promotional code advertised in the weekly entertainment magazine, it may be readily ascertained that the advertised product is not particularly appealing to the demographic group who purchase and read the weekly entertainment magazine.  Thus, by analyzing the list of promotional codes and associated promotional code counts, a retailer may readily discern which advertising media is best equipped to reach consumers of various goods.").

[56] D.I. 104, Ex. B at 3:30-36; 10:20-24; 16:44-54 (In describing the system, the patent states it is a point-of-sale discounting system "in which the consumer uses publicly distributed promotional codes . . . to automatically receive discounts on purchased goods," and which allows the retailer "to readily compare consumer response to various advertising campaigns in which the promotional codes were distributed . . . .).

[57] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).

term."[58]  Here, the specifications of the patents-in-suit in describing the present

inventions and in the written descriptions direct the manner in which consumers obtain

or are aware of promotional codes, that is, through public distribution or

advertisements.[59]

Defendants' argument that CodePro's proposal of "a series of characters" makes

claims 1 and 16 of the '078 patent superfluous, and violates the tenet of giving meaning

to all terms of the claim, misstates Codepro's entire construction, and attempts to isolate

each phrase rather than reading the proposed construction as a whole.  Defendants'

argument fails to address CodePro's modifying language that the series of characters

be associated with discount information, and ignores the language of the claims and

specification.

Claim 1 states how promotional codes are to be entered (as a series of

characters); it does not provide as an element "associated to discount information."

Claim 16, a dependent claim, limits promotional code to a series of *alpha-numeric*

characters, does not provide as an element an association to discount information, and

requires a separate key to indicate that the series of alpha-numeric characters is a

promotional code.  As the specification repeatedly acknowledges, promotional codes

are comprised of a series of characters which are related to discount information.[60]

CodePro's proposal does not only construe a promotional code as a series of

characters, but also requires those characters be associated with discount information.

[58] *Id.*
[59] *See Honeywell Int'l Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (noting "the public is entitled to take the patentee at his word").
[60] D.I. 104, Ex. A at 2:57-59; *id.* at 4:18-21; *id.* at 10:63-65; *id.* at 11:10-15; *id.* at 13:42-26; *id.* at 14:9-16; *id.* 14:29-35.

Regarding defendants' arguments that construction requires the limitation "paperless coupon," the intrinsic record only references this term on two occasions: in the discussion in the specification of the prior art reference "Valencia," and in the prosecution history of the '078 patent where the applicant distinguished the Weinblatt prior art reference. Regarding Valencia, the specification claims the prior art reference discloses a smart card "capable of electronically carrying a number of paperless coupons."[61] When the card is inserted in a device, potential discounting information is retrieved from the card.[62] The specification distinguishes Valencia because, unlike the '078 patent, it does not "directly motivate a consumer to, in response to a specific advertised promotion, visit a particular store to take advantage of the promotion."[63] Nothing in the specification's reference to Valencia limits promotional code to a paperless coupon. This finding equally applies to the '866 patent, since its discussion of Valencia is exactly the same as the '078 patent.[64]

In distinguishing Weinblatt, the applicant argued the reference "does not offer 'paperless coupons' or any other type of discount for items bought by the consumer."[65] It is a system to determine the efficacy of an advertising or promotional campaign without any associated discount.[66] In differentiating Weinblatt, the applicant stated the reference provides "no mechanism to offer promotional codes *or* paperless coupons to consumers, *such that* the consumer receives a discount for purchasing a product using

---

[61] *Id.* at 2:36-39.
[62] *Id.* at 2:39-41.
[63] *Id.* at 2:42-44.
[64] D.I. 104, Ex. B at 2:29-59.
[65] D.I 96, Ex. 3 at 4.
[66] *Id.*

the promotional code."[67]  That language does not demonstrate that the applicant

intended promotional codes to be synonymous with paperless coupons.  Weinblatt was

distinguished from the '078 patent because the reference is not a discounting system.[68]

Despite defendants' arguments to the contrary, there is no clear disavowal or disclaimer

by the patentee in the specifications or the prosecution history for the limitation

paperless coupons.

In CodePro's objection to defendants' proposed language of "corresponds to and

promotes a product," it argues such language requires one-to-one correspondence

between promotional code and a product, and thereby excludes a preferred

embodiment, which allows one promotional code to correspond to multiple or a family of

products.[69]  Defendants rely on areas in the specification of the '078 patent that

promotional codes correspond to a product.[70]  They also point to the '866 patent as

additional evidence that the invention covers promotional codes corresponding to

products based on its title, its representation of the present invention and the patent's

---

[67] *Id.* at 5 (emphasis added).

[68] Contrary to defendants' argument, the language quoted from the examiner's Search Notes when read in context with the entire entry does not equate promotional code with paperless coupons. Rather, it distinguishes the system in the '866 patent from the coupon system.  *Id.*, Ex. 4 ("Also pulls potential customers into the store rather than coupon systems that require the customer to already be in the store (e.g. coupon racks in store).").  Further, the Search Notes is not an analysis by the examiner in an office action, nor a representation or disclaimer by the applicant during the patent prosecution.  Rather, they describe a search field.

[69] D.I. 103 at 6 (citing 104, Ex. A at 13:28-35 ("In one embodiment of the invention, the promotional code entries 20-N may includes multiple entries having the same promotional code field 20-N-1 but different promotional information entered in other fields [product code and/or discount fields] . . . .  By doing so, a discount for any member of a product family may be provided by the use of a single promotional code.").

[70] D.I. 95 at 9 (citing '078 patent at 6:61-62; 13:36-38; 16:11-12 all referencing promotional code which corresponds to or is associated with the purchased product or a single product code, or products corresponding to promotional codes).

two embodiments.[71]

All embodiments of both patents acknowledge a relationship between

promotional codes, discounts and a product or products or product promotions.[72]  In

each embodiment and the aspects following an embodiment, use or entry of the

promotional code or codes correspond to a discount and a product or products.[73]

---

[71] D.I. 95 at 9-10 (citing the '866 patent at 1:19-22, "The present invention generally relates to systems for comparative analysis of consumer response to product promotions and, more particularly relates to a system which analyzes consumer response to product promotions based upon consumer usage of promotional codes."); D.I. 101 at 5 (referencing the '866 patent at 3:37-39, under the summary of the invention, the first embodiment states "[e]ach one of the series of promotional codes/promotional entries related to separate promotions for a product); *id.* at 4:4-7 ("In the second embodiment the present invention is of a method for consumer analysis or consumer response to product promotions.").

[72] D.I. 96, Ex. 1 '078 patent at 2:57-64 (describing the first embodiment "which accepts promotional codes . . . determines if the entered promotional codes relate to one of the promotions.  If so, discount information is transmitted . . . ."); *id.* at 2:67-3:1(regarding an aspect of the first embodiment, "for each one of the promotions, a promotional code, product code and discount amount . . . ."); *id.* 3:9-12("In another aspect thereof . . . [after receiving the promotional code] the software module transfers the product code and discount amount . . . ."); Regarding the first embodiment of the '078 patent, *see also id.* at 3:20-23.

D.I. 96, Ex. 1 '078 patent at 3:24-45 (concerns the second embodiment which discusses a "discounting system" and "discounting information" in relation to promotions using promotional codes); *id.* at 3:46-49, 3:53-54, 3:63-64, 4:1-2, 4:10-12 (describing aspects of the second embodiment): *id.* at 4:27-39 (describing the third embodiment as transmitting "discount information for each determined promotional code"); *id.* at 4:41-65 (discussing aspects of the third embodiment which activate or makes up the discounting device); *id.* at 4:66-5:2 (another aspect of the third embodiment "in which at least one promotional code, together with corresponding . . . product codes and discount amounts are stored . . . ."); *id.* at 5:13-29 (describing another aspect of the third embodiment which compares the product code and discount amount corresponding to a first promotional code).

D.I. 96, Ex. 1 '078 patent at 5:31-45 (addressing the fourth embodiment where a series of promotion codes is compared to a corresponding series of promotional information which result in the cost of the point-of-sale transaction being discounted using the transmitted promotional information).  All aspects of the fourth embodiment allow a discount amount on a product if corresponded to the promotional code.  *See id.* at 5:46-6:6.

The first embodiment of the '866 patent states "[i]n the first embodiment, the *present invention* is of a method for analyzing consumer response to product promotions which provide discounts during point-of-sale transactions."  *See* D.I. 96, Ex. 2 at 3:23-25 (emphasis added).  All aspects following are dependent.  *Id.* at 3:39-4:3.

As to the second embodiment, "the *present invention* is of a method for comparative analysis of consumer response to product promotions which provide discounts during point-of-sale transactions."  *Id.* at 4:4-7 (emphasis added).  The aspect following is dependent on the second embodiment.

[73] In so finding, the court need not address defendants' arguments that the preamble to claim 1 of the '866 patent is limiting.  The court is mindful, however, of *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) and *Pitney Bowes, Inc. v. Hewlett-Packard,Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).

As to the final limitation proposed by defendants, that is, "not a customer identification code," although Valencia may have disclosed a "smart card . . . issued to each consumer which would include the customer's identification number,"[74] no where in the specification of either patent-in-suit did the patentee distinguish Valencia based on a customer or personal identification code.  As discussed previously herein, the patentee pointed out this prior art reference did not encourage customers to visit a particular store in response to an advertised promotion.  Defendants' argument that the patentee clearly distinguished Weinblatt because it did not offer a mechanism, such as a promotional code, for discounts to consumer, but offered a unique customer or personal code instead, misstates the patentee's response to the examiner's office action and comments.[75]  Rather, as previously noted, the patentee distinguished Weinblatt system because it offered no means, "such that the consumer receives a discount for purchasing a product using a promotional code," where "promotional codes . . . are used to deliver discounts," or "the step of discounting an item based on the receipt of a valid promotional code."[76]  Nothing in the prosecution history regarding Weinblatt warrants a negative implication or demonstrates a clear disclaimer or disavowal.[77]

## V.    Order and Disposition

At Wilmington, the **14th** day of **May**, **2013** having reviewed the papers submitted

---

[74] D.I. 96, Ex. 8 at 3:16-17.
[75] D.I. 101 at 9.
[76] D.I. 96, Ex. 3 at 5.
[77] *Omega Eng'g, Inc v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("Rather, we have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness . . . .  Consequently, . . . our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.") (internal citations omitted).

with the parties' proposed claim constructions, heard oral argument, and considered the

parties arguments (whether those arguments were explicitly discussed *supra)*;

IT IS ORDERED, ADJUDGED, and DECREED the disputed claim language of

the patents-in-suit, as identified by the parties, and construed consistent with the

tenants of claim construction set forth by the United States Court of Appeals for the

Federal Circuit in *Phillips v. AWH Corp.,* is as follows:

| Promotional Code | A series of publicly distributed or advertised characters associated with discount information corresponding to a product or products |
|---|---|